# United States Court of Appeals
### For the Eighth Circuit

_____

No. 21-3256
_____

I Square Management, LLC; Arkansas Knoxville Hotel, LP

*Plaintiffs - Appellants*

v.

McGriff Insurance Services, Inc.

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central
_____

Submitted: September 21, 2022
Filed: November 9, 2022
_____

Before LOKEN, ARNOLD, and KOBES, Circuit Judges.
_____

ARNOLD, Circuit Judge.

This case involves a flood that destroyed property stored at a warehouse. Unfortunately for the companies with an interest in the property, insurance didn't cover their loss, and so they sued their insurance agent for negligence. The district

court[1] granted summary judgment to the agent on the ground that it had no duty to give advice about different coverages or to ensure that adequate coverage existed. The companies appeal, but we affirm.

I Square Management LLC is a hotel management company that, according to its chairman and CEO Shashwat Goyal, also builds and renovates existing hotels. One of those hotels was in Knoxville, Tennessee. Goyal helped create Arkansas Knoxville Hotel, LP (AKH), to purchase the hotel, and AKH and I Square entered into a hotel management agreement. I Square and AKH planned a significant renovation of the hotel, and, as part of that renovation, I Square and AKH purchased furniture, fixtures, and equipment in bulk and stored it all in a warehouse. At one point during the project their insurance agent, McGriff Insurance Services, Inc., advised the project's general contractor that a builder's risk policy was unnecessary for the construction. After a flood damaged or destroyed property in the warehouse, I Square and AKH filed claims with their insurers, but those claims were denied. They therefore sued McGriff, alleging that it had negligently advised that they need not purchase a builder's risk policy for the project.

To prevail on a negligence theory under Arkansas law, which applies in this diversity case, *see Chew v. Am. Greetings Corp.*, 754 F.3d 632, 635 (8th Cir. 2014), a plaintiff must prove, among other things, that the defendant owed it a duty. *See Duran v. Sw. Ark. Elec. Coop. Corp.*, 537 S.W.3d 722, 726 (Ark. 2018). Determining whether a defendant owed a duty to the plaintiff is a question of law for the court, and if the court determines that no duty is owed, then summary judgment is appropriate. *See id.* at 727. If Arkansas law is unclear on whether a duty is owed, we must do our best to predict how the Arkansas Supreme Court would rule in the circumstances. *See Cincinnati Ins. Co. v. Rymer Cos., LLC*, 41 F.4th 1026, 1029 (8th Cir. 2022); *see also*

---

[1]The Honorable James M. Moody Jr., United States District Judge for the Eastern District of Arkansas.

*Chew*, 754 F.3d at 635. Decisions from the Arkansas Court of Appeals may provide some evidence of how the Arkansas Supreme Court would rule, but we are not bound to follow them. *See Burger v. Allied Prop. & Cas. Ins. Co.*, 822 F.3d 445, 447 (8th Cir. 2016).

In determining the duties an insurance agent owes its clients, the Arkansas Supreme Court has consistently applied what it described as a "long established rule placing a responsibility on the insured to educate himself concerning matters of insurance coverage." *See Stokes v. Harrell*, 711 S.W.2d 755, 756 (Ark. 1986). That means that it is the insured's "responsibility to adequately convey, albeit in laymen's terms, the nature of his wishes, in order to obtain the protection requested," and so "[a]n agent may point out to him the advantages of additional coverage and may ferret out additional facts from the insured applicable to such coverage, but he is under no obligation to do so." *See id.*

The *Stokes* court recognized, however, that where an agent and an insured have a "special relationship," some jurisdictions impose a duty on the agent to advise clients of appropriate insurance coverage. *See id.* But the court in that case immediately signaled that it was skeptical about that rule, and our overall impression from reading that court's opinions on the subject is that it takes a dim view of what is called the special-relationship exception, though it has been hesitant to say that it could never apply. We offer three reasons to support that impression.

First, in the 36 years since the Arkansas Supreme Court decided *Stokes*, that court has never applied the exception, as far as we can tell, to impose additional duties on agents. Nor has the Arkansas Court of Appeals. Not once.

Second, as we've already noted, the court in *Stokes* didn't seem impressed by the insured's argument. After noting that "some jurisdictions" had imposed additional duties thanks to a special relationship, the court immediately said that those decisions

had "not found a large following among the courts." *See id.* It did, however, explain that a special relationship would entail "an established and ongoing relationship between the insured and the agent over a period of time, with the agent actively involved in the client's business affairs, and regularly giving advice and assistance in maintaining the proper coverage for the client." The court stopped short of saying that the exception was part of Arkansas law and instead held merely that, even if it were, the facts of that case wouldn't support applying it. *See id.*

Third, when it seemed that the facts of a case might call for applying the special-relationship exception, the Arkansas Supreme Court didn't do so. *See Mans v. Peoples Bank of Imboden*, 10 S.W.3d 885 (Ark. 2000). There a widow sued an insurance agent for negligence after it failed to discover that her husband's life insurance policy had lapsed. *See id.* at 886. The court expressly held that no special relationship existed even though the widow had done business with the agent for 23 years, was unsophisticated, and had trusted the agent's advice. *See id.* at 889–90. And so the court applied the general rule that the insured "has a duty to educate herself concerning her insurance." *See id.* at 888, 890. As in *Stokes*, the court never expressly embraced the exception, recognizing merely that "some jurisdictions" have and that a special relationship "may" be found in certain circumstances. *See id.* at 888.

I Square and AKH invite us to focus on language from an Arkansas Court of Appeals opinion that, they say, supports its view. *See Buelow v. Madlock*, 206 S.W.3d 890 (Ark. Ct. App. 2005). There, the court said that the insured can prove "a special relationship by showing that there exists something more than the standard insurer-insured relationship," *see id.* at 893 (quoting *Sintros v. Hamon*, 810 A.2d 553, 556 (N.H. 2002)), which is something determined on a case-by-case basis and presents a question of fact. *See id.* It also explained that a special relationship might exist when there is an "express agreement, long established relationships of entrustment in which the agent clearly appreciates the duty of giving advice, additional compensation apart from premium payments, and the agent holding out as a highly-skilled expert coupled

-4-

with reliance by the insured." *See id.* (quoting *Sintros*, 810 A.2d at 556). I Square and AKH say that "something more" than the ordinary insurance relationship existed here: it points out that McGriff held itself out as a highly skilled expert and that they relied on those assurances to their detriment. And, they add, since the presence of a special relationship is a question of fact, the district court here should not have granted summary judgment to McGriff.

We are not convinced that the *Buelow* court's digression into *Sintros* was meant to open the door to expanded duties for insurance agents. It would be the rare agent who does not hold himself out as highly skilled, and the rare insured who doesn't rely on the agent's skill in making insurance selections. We do not think the Arkansas Supreme Court, given its skepticism about expanding liability, would now ask merely for the presence of "something more" than the ordinary relationship to do so; otherwise the exception would bid fair to swallow the rule. And so we are not inclined to give this aspect of *Buelow* much weight. We point out, moreover, that the *Buelow* court ultimately declined to find a special relationship and reversed a trial court decision imposing additional duties on the agent, *see id.* at 894, adding another case to the unbroken string of Arkansas appellate decisions rejecting this theory of liability.

I Square and AKH argue that there is more in this record to support a conclusion that McGriff had a duty that exceeded that of an ordinary insurance agent. They first point to how their relationship with McGriff began, explaining that it was McGriff (or more specifically, its predecessor, but for ease of reference, we will just use "McGriff") who expressed interest in doing business with I Square and not the other way around. McGriff then met with I Square at I Square's offices where it gave a personalized pitch promoting McGriff's insurance prowess and a plan that would streamline I Square's insurance practices and save it money. McGriff also promised to service I Square's existing policies for free, and when those policies were due for renewal, McGriff would recommend a plan whereby I Square would purchase one

universal policy to cover all its projects rather than obtain multiple policies covering different projects. So I Square abandoned its existing agent and turned to McGriff.

According to Goyal, over the next months McGriff employees met with I Square several times to get a better understanding of I Square's business. The meetings were so frequent, he says, that I Square's staff made sure that at least one McGriff employee's favorite jellybeans were on hand. At that time I Square was working on other projects for which it bought furniture, fixtures, and equipment in bulk and stored them offsite. Goyal says that, at least for some of these projects, I Square told Nick Hall of McGriff about the offsite storage on those projects and asked him to obtain additional policies to insure the property stored there, which he did.

We conclude that the circumstances surrounding the commencement of the parties' relationship are insufficient to demonstrate a special relationship under Arkansas Supreme Court precedent. It's unlikely that the Arkansas Supreme Court would think it unusual that an agent interested in obtaining new business would promote its expertise to a potential client who then relies on those promotions to make insurance decisions, *see Mans*, 10 S.W.3d at 888, even if that agent took steps to learn how the client's business operated so that it could provide sound advice. Note, too, that the court in both *Stokes* and *Mans* emphasized that a special relationship would involve "an established and ongoing relationship between the insured and the agent over a period of time." *See Stokes*, 711 S.W.2d at 756; *see also Mans*, 10 S.W.3d at 888. Here, McGriff's relationship with I Square and AKH existed for only about two years before the warehouse flooded, and, after what appears to be a brief honeymoon phase at the beginning of their relationship, McGriff was not involved in I Square's operations to the extent necessary to make for a special relationship under Arkansas Supreme Court precedent. Under Arkansas law, it was still incumbent upon I Square and AKH to ensure that the insurance it obtained provided adequate coverage for its projects.

-6-

In addition to the parties' early dealings, I Square and AKH point to McGriff's participation in the Knoxville project itself as evidence that they and McGriff had a special relationship. For example, they point out that Hall communicated directly with the mortgage broker involved in the Knoxville project as well as the project's general contractor and the insurer about insurance coverage on the project.

But those communications don't get I Square and AKH across the line. Hall's communications to these project participants were isolated and infrequent and appear to have concerned only the hotel site and not the warehouse where property was damaged. In fact, Hall's communications with the mortgage broker predate the lease to the warehouse. The record shows that I Square, AKH, and the project's general contractor handled the warehouse without McGriff's involvement until well after the flood. They had obtained separate insurance on the property in the warehouse without McGriff's assistance, moreover, and after the warehouse flooded, they looked to this separate coverage first to cover their losses. It appears as well that Goyal asked McGriff to help file a claim with this separate insurer, and it was only later that I Square and AKH filed a claim with the insurance that McGriff had obtained on its behalf. The main point is that McGriff was involved in the Knoxville project only tangentially, and certainly not to an extent that creates a special relationship under Arkansas law.

We therefore hold that, whether we consider the circumstances I Square and AKH highlight in isolation or cumulatively, they have failed to show the existence of a special relationship between McGriff and the insureds that gave rise to additional duties on the part of McGriff to ensure that they had adequate coverage.

Finally, I Square and AKH assert that, even if no special relationship existed, McGriff voluntarily assumed a duty to ensure adequate coverage existed. *See Farm Credit Midsouth, PCA v. Bollinger*, 548 S.W.3d 164, 176 (Ark. Ct. App. 2018). They point to the email Hall sent to the project's general contractor advising that a builder's

risk policy was unnecessary. But this is far from an assurance like the one in *Bollinger* that was a promise to "handle" an insurance difficulty. *See id.* All Hall did here was respond to an inquiry from the general contractor. The record simply does not support a conclusion that McGriff, through Hall, voluntarily assumed additional duties to I Square and AKH.

But even if it did, we think that any assumed duty to give proper advice would have been based on the knowledge that McGriff had about the project, and it does not appear that anyone at I Square or AKH had told McGriff about the warehouse or that McGriff otherwise knew about it such that it could ensure it was properly covered. I Square and AKH vigorously contend otherwise, arguing that Hall's knowledge or lack of knowledge of the warehouse is "the most hotly contested fact there is in this case." But we don't think the record on this point is sufficient to reach a jury because no reasonable jury could believe that Hall knew about the warehouse. I Square and AKH have not identified a single communication to or from Hall or anyone else at McGriff about the warehouse until after the flood, nor do they point to testimony from anyone who says that he told Hall or McGriff about the warehouse. Surely Hall didn't assume a duty to advise about proper coverage for a location he didn't even know existed.

I Square and AKH argue nonetheless that Hall did know about the warehouse for a few reasons. First, they say that Hall had participated in three other projects that entailed storing furniture, fixtures, and equipment offsite and that Hall knew about the offsite storage and helped insure it. But that doesn't show that Hall knew about offsite storage here; in fact, two of those other projects apparently involved "ground-up" construction projects and not a "floor by floor" renovation where onsite storage might be more feasible. And according to Goyal, for those other projects in which offsite storage was used, I Square and AKH specifically told Hall about the warehouses, but nothing in the record indicates they did so here for the Knoxville project.

I Square and AKH also point to a memo created by an insurance investigator who interviewed Hall after the flood, and they say that the memo shows that Hall admitted "that he knew about the warehouse's existence when the renovations began" and "that he just 'assumed'" the other insurance would cover it. We think I Square and AKH misread the memo. We read it to say merely that Hall, at the time of the investigation a few months after the flood, had obtained communications from others about the warehouse that were dated around the time the project began, not that he personally was involved in conversations about the warehouse before the flood. And we think the memo quite clearly says that it was I Square and AKH that mistakenly assumed the property in the warehouse was covered, not that Hall thought that.

And finally, I Square and AKH say that Hall knew about the warehouse because he obtained a copy of the construction contract that referred to storage of materials. But this oblique reference to the potential need for warehousing in a seventeen-page, single-spaced construction contract cannot reasonably be thought to supply Hall with knowledge of the actual warehouse, especially since the warehouse had not even been obtained until months after Hall received a copy of the contract.

So even if Hall assumed a duty to give accurate advice when he responded to the general contractor's insurance inquiry, the scope of the duty assumed could only reasonably be interpreted to include the giving of advice about circumstances that Hall actually knew of. And the record won't support a conclusion that he knew about the warehouse.[2]

Affirmed.

_____

[2]Appellants' motion to supplement the record is denied.